**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| **MICHAEL KEENER,**          ) | |
|                        ) | |
|       **Plaintiff,**         ) | |
|                        ) | |
| **v.**                       ) | **Case No.  06-CV-0928-MJR** |
|                        ) | |
| **MICHAEL J. ASTRUE[1],**     ) | |
| **Commissioner of Social Security,**    ) | |
|                        ) | |
|       **Defendant.**       ) | |

## MEMORANDUM AND ORDER

**REAGAN, District Judge:**

Plaintiff Michael Keener, pursuant to 42 U.S.C. § 405(g), seeks review of the

administrative decision denying him Disability Insurance Benefits ("DIB") pursuant to 42 U.S.C.

§ 423, and Supplemental Security Income ("SSI") pursuant to 42 U.S.C. § 1382.  (Doc. 2).  The

administrative record ("R") and the parties' briefs[2] are before the Court.  (Docs. 12, 17, 20 and 23).

Plaintiff formally alleged onset of disability as of February 15, 2000.  (R 210).

Initially, in June 2004, a partially favorable decision was issued by ALJ Anne C. Pritchett, finding

plaintiff disabled as of June 27, 2002.  (R. 177-184).  Because plaintiff was only insured for DIB

---

[1]On February 12, 2007, Michael J. Astrue became the Commissioner of Social Security.
In accordance with Fed. R. Civ. P. 25(d)(1) and the last sentence of 42 U.S.C. § 405(g), Michael
J. Astrue is, therefore, automatically substituted as the Defendant in this civil action, and no
further action is necessary to continue this case.

[2]Neither plaintiff nor defendant are apparently aware that Local Rule 7.1(d) limits briefs
to 20 pages and replies to five pages.  Plaintiff's brief is 47 pages long; defendant's brief is 22
pages long, and plaintiff's reply brief is 15 pages long.  In the interest of judicial economy, the
oversized documents have not been stricken.

through March 31, 2002, he was only granted SSI payments. The Appeals Council remanded the matter, and in March 2006 another partially favorable decision was issued. (R. 21-32; 191-193). The second time around, ALJ Pritchett found plaintiff disabled effective August 22, 2005, a much later date, which also means there has been an overpayment.

## Issues Presented

Plaintiff Keener argues:

1.      The agency failed to sustain the burden of establishing that there is other work in the national economy that plaintiff could perform.

      A.      The ALJ failed to inquire of the vocational expert in the second hearing whether his testimony corresponds with the Dictionary of Occupational Titles.

      B.      The ALJ failed to pose a hypothetical to the vocational expert which incorporated all of plaintiff's limitations supported by medical and other evidence.

2.      The ALJ erred in failing to recontact plaintiff's treating physicians for additional evidence or clarification on the issues of onset date and severity of symptoms.

3.      The ALJ erred by failing to follow the requirements of SSR 83-20 in determining plaintiff's disability onset date.

4.      The ALJ erred in discounting plaintiff's subjective complaints due to the lack of objective medical evidence of his impairments when the agency had refused to order testing when requested by plaintiff.

Plaintiff's arguments are aimed at undermining the ALJ's residual functional capacity assessment and ultimate conclusion that plaintiff is not disabled.

## Applicable Legal Standards

To qualify for DIB or SSI, a claimant must be "disabled." "Disabled" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A) and 1382c(a)(3)(A). A "physical or mental impairment" is an impairment resulting from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques. 42 U.S.C. §§ 423(d)(3) and 1382c(a)(3)(C).

Social Security regulations set forth a sequential five-step inquiry to determine whether a claimant is disabled. In essence, it must be determined (1) whether the claimant is presently employed; (2) whether the claimant has an impairment or combination of impairments that is severe; (3) whether the impairments meet or equal one of the listed impairments acknowledged to be conclusively disabling; (4) whether the claimant can perform past relevant work; and (5) whether the claimant is capable of performing any work within the economy, given his or her age, education and work experience. **Schroeter v. Sullivan, 977 F.2d 391, 393 (7th Cir. 1992); 20 C.F.R. §§ 416.920(b-f) and 404.1520(b-f).**

"The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. . . ." **42 U.S.C. § 405(g).** Thus, the Court must determine not whether plaintiff was, in fact, disabled, but whether the ALJ's findings were supported by substantial evidence and, of course, whether any errors of law were made. **See Books v. Chater, 91**

**F.3d 972, 977-978 (7th Cir. 1996) (citing *Diaz v. Chater*, 55 F.3d 300, 306 (7th Cir.1995)).**  The

Supreme Court has defined substantial evidence as "such relevant evidence as a reasonable mind

might accept as adequate to support a conclusion." ***Richardson v. Perales*, 402 U.S. 389, 401**

**(1971).**

        In reviewing for "substantial evidence" the entire administrative record is taken into

consideration, but this Court *does not* reweigh evidence, resolve conflicts, decide questions of

credibility, or substitute its own judgment for that of the ALJ.  ***Brewer v. Chater*, 103 F.3d 1384,**

**1390 (7th Cir. 1997).**  Furthermore, an ALJ may not disregard evidence when there is no

contradictory evidence.  ***Sample v. Shalala*, 999 F.2d 1138, 1143 (7th Cir. 1993).**

### The Agency Decisions

        ALJ Pritchett's June 2004 decision found that plaintiff Keener was disabled as of

June 27, 2002, which was well after the February 15, 2000, alleged onset date, and March 31, 2002,

when plaintiff was last insured for DIB.  (R. 177-184).  Plaintiff was found to have the following

severe impairments:  hand tremors, deficits from a gunshot wound to the left patella, shortness of

breath, a reading disorder, a disorder of written expression, alcohol abuse in partial remission, and

degenerative disc and joint disease.  (R. 183).  Plaintiff underwent a consultative physical

examination by Dr. Stanley Rabinowitz, M.D., and a consultative intellectual assessment by Dr.

Michael Stempniak, Ph.D., on June 27, 2002.  (R. 179-180, 288-293).  The ALJ's decision noted

that, prior to June 27, 2002, the record did not contain objective medical evidence to support any

other conclusion than that plaintiff had the residual functional capacity for work (with no exertional

limits).  It was the additional physical impairments established on June 27, 2002, combined with the

exclusion of jobs that require reading, writing or mathematics, that rendered plaintiff disabled.  (R.

182).  The ALJ concluded that, as of June 27, 2002, plaintiff could not perform any work due to the progression of plaintiff's tremors to a point that they moderately interfered with his ability to sustain a steady gaze.  (R. 184).  The ALJ cited the testimony of vocational expert Dr. John Grenfell that unskilled, sedentary jobs require some reading and simple record-keeping skills or sustaining a steady gaze.  (R. 182).

In May 2005, the Appeals Council vacated and remanded ALJ Pritchett's June 2004, decision.  (R. 191-193).  The Council observed an apparent inconsistency between the blanket finding that plaintiff had numerous "severe" impairments, and the apparent finding and evidence indicating there were no exertional or work-related limitations during the period between February 15, 2000, and June 27, 2002.  (R. 191).  More important, the Council questioned how the June 27, 2002, evaluations could form the basis for the reduced sedentary residual functional capacity.  (R. 191-192).  Why some or all of plaintiff's limitations were not found to exist prior to June 27, 2002, was also questioned.  (R. 192).  The Council indicated that further evaluation and development of the record were required, specifically including: (1) the gathering of additional evidence of medically determinable impairments; (2) further consideration and elucidation of plaintiff's maximum residual functional capacity; (3) utilizing a qualified medical expert to clarify impairments and, if necessary, determine the onset date; and (4) if warranted by the expanded record, obtaining additional evidence from a  vocational expert, utilizing the prescribed methodology and standards.  (R. 192).

On remand, ALJ Pritchett abandoned the June 27, 2002, onset date and found that disability did not occur until August 22, 2005.  (R. 21-32).  Prior to August 22, 2005, plaintiff was found to have the following severe impairments:  reading disorder, disorder of written expression,

chronic obstructive pulmonary disease (COPD), and alcohol abuse and dependence. (R. 23 and 30). As of August 22, 2005, two additional severe impairments were added: essential tremors and neck pain with a limited range of motion. (R. 26, 28 and 30-31). August 22, 2005, was the date that Dr. Raymond Leung, M.D., issued a consultative physical evaluation (R. 411-419), and Dr. Harry Deppe, Ph.D., issued a psychological consultative evaluation (R. 420-423).

Although the ALJ's 2006 decision noted that plaintiff had "mild" tremors in June 2002, they were characterized as "moderate" on August 22, 2005, and evidence prior to that date did not support the conclusion the tremors had more than a minimal effect on plaintiff's ability to perform basic work activities. (R. 23). As of August 22, 2005, plaintiff had mild but constant head tremors that moderately interfered with his ability to sustain a steady gaze. (R. 28). A similar time lag was noted between when plaintiff first exhibited neck pain and minimal osteoarthritic changes in 1999, and August 22, 2005, when plaintiff's range of motion and subjective complaints were deemed a severe impairment. (R. 23-24).

ALJ Pritchett's 2006 decision noted that, although plaintiff alleged disability since February 15, 2000, he did not seek medical treatment until January 8, 2003, when he sought a physical for purposes of obtaining disability benefits. (R. 25). The ALJ highlighted that Dr. Robbins's report reflected that plaintiff had not seen a doctor in many years and that plaintiff had no medical history to discuss. (R. 25 and 372-373). The ALJ surveyed the subjective and objective evidence and, with the aid of medical expert Dr. William Houser, found there was no evidence of qualifying disability before August 22, 2005. (R. 23-28).

At the time of the second decision, plaintiff was 50 years old and "closely approaching advanced age; for the period prior to August 22, 2005, plaintiff was "younger." (R. 29).

Plaintiff only completed the 11th grade, taking special education classes, and he had a vocational history of semi-skilled work with no transferable skills. (R. 29). From a physical standpoint, prior to August 22, 2005, plaintiff was found to be capable of lifting and carrying 20 pounds occasionally and 10 pounds frequently, standing and/or walking and sitting for up to six hours out of an eight-hour workday. (R. 28). Only occasional exposure to temperature extremes and respiratory irritants (dust, fumes and gases) was prescribed, and plaintiff was further limited to unskilled work where reading, writing and mathematics were not required. (R. 28). Based on those factors, plaintiff was found to have the residual functional capacity for a significant range of light work. (R. 28 and 31). However, that vocational base was further eroded by nonexertional limitations. (R. 29). From a psychological standpoint, the ALJ concluded plaintiff had only mild limitation upon activities of daily living and maintaining social functioning, and moderate limitation on his ability to maintain concentration, persistence or pace. (R. 29).

Relative to the period prior to August 22, 2005, the ALJ cited the testimony of vocational expert Dr. Thomas Upton that the following jobs remained available to a person with the aforementioned profile: kitchen helper (5,100 light jobs in Ill.); machine tender (1,600 light jobs and 1,700 sedentary jobs in Ill.); laundry worker (2,000 light jobs and 1,900 sedentary jobs in Ill.); and assembler (37,900 light jobs and 8,000 sedentary jobs in Ill.). (R. 30). The ALJ asserted that the vocational expert had stated that there were no conflicts with the Dictionary of Occupational Titles. (R. 30). For the period after August 22, 2005, the ALJ relied upon Dr. Upton's testimony that the addition of a constant mild tremor that moderately interfered with the ability to sustain a steady gaze would preclude the aforementioned jobs. (R. 30).

On September 11, 2006, the Appeals Council declined plaintiff's request for review,

thereby making ALJ Pritchett's March 8, 2006, decision the final, appealable agency opinion.  (R. 8-10).

## Synopsis of Relevant Evidence

Plaintiff offers a 25-page digest of the record, which defendant has adopted.  The following brief chronology highlights what the Court considers of particular relevance to the review of the agency's decision.  The most import dates framing the analysis are:  February 15, 2000, the alleged onset of disability; March 31, 2002, the date plaintiff was last insured for DIB; June 27, 2002, the onset date found in the 2004 decision; and August 22, 2005, the onset date found in the second decision.

In February 1999, plaintiff was in a motor vehicle accident.  Intracranial trauma was suspected, so he was airlifted from Memorial Hospital in Chester, Illinois, to St. Louis University Hospital in St. Louis, Missouri.  (R. 318).  Plaintiff was diagnosed with a closed head injury and facial lacerations, and it was determined his blood alcohol was "218."  (R. 376-377).  X-ray and CT scans of plaintiff's head, chest and full spine were all negative.  (R. 377 and 391).  Plaintiff's pain was considered well controlled.  (R. 377).  After two days, plaintiff was discharged with a prescription for Tylenol #3 and instructions to resume regular activity as tolerated.  (R. 278).  In March 1999, additional radiological views revealed a stable spine.  (R. 287).  At that time, the medical records note that plaintiff had a tremor.  (R. 286).

Prior to the accident, plaintiff had worked for over six years as a deck hand on a river tow boat, which is characterized as heavy, unskilled work.[3]  (R. 241 and 60).  Plaintiff did not return

---

[3]Heavy work involves lifting no more than 100 pounds at a time and frequently lifting or carrying 50 pounds.  **20 C.F.R. § 4041567(d).**

to that work after the accident; rather, plaintiff took a job as a mixer at the Gilster-Mary Lee cake mix factory, where his job entailed lifting and dumping bags of ingredients weighing 50-100 pounds into a mixer. (R. 59, 72 and 241-242). Plaintiff only worked at Gilster-Mary Lee for two months– until February 15, 2000, his alleged onset date. (R. 212 and 241).

Plaintiff offered varying explanations for why he switched to working at the cake mix factory. In his application, plaintiff specified that he did not work in 1999 because he was "between jobs," not because of disability. (R. 212). Plaintiff subsequently told Dr. Deppe, who was performing a consultative psychological exam, that he "switched jobs for more money and that didn't work out." (R. 422). With regard to plaintiff's attempt to work at Gilster-Mary Lee, a November 2002 letter written by plaintiff's supervisor at Gilster-Mary Lee, Dale Maurer, indicates plaintiff's work was limited to light duty because plaintiff had a bad back and severe pain. (R. 262). Maurer further stated that plaintiff had difficulty reading and comprehending the recipes. (R. 262). Plaintiff quit the job because he could not perform his job duties due to disability. (R. 212 and 262).

Three months later, in May 2002, plaintiff initiated the application for SSI and DIB benefits. (R. 209). Plaintiff attributed his disability to his back and neck post-accident, and difficulty breathing. (R. 209). Agency personnel noted that plaintiff had such difficulty reading and writing that he would need assistance with the application forms. (R. 209). Plaintiff explained that he had neck pain due to an accident, constant low back pain, breathing difficulty, knee pain and tremors. (R. 228). Plaintiff described having pain sitting or standing for any length of time, as well as difficulty focusing and maintaining grasp due to his tremors. (R. 228). Plaintiff noted that he had not had testing because of financial and/or insurance difficulties. (R. 235).

Plaintiff did not seek medical attention until January 8, 2003. (R. 373). However, in June 2002, plaintiff completed a questionnaire regarding his activities of daily living, wherein he indicated he cleaned, vacuumed and dusted around the house, but did so slowly. (R. 237). Plaintiff reported that he could tend to his personal care. (R. 237). According to plaintiff, he had trouble sleeping due to back pain and difficulty breathing, but his only medication was aspirin for pain. (R. 237-238). Plaintiff reported that he did not like to be around people, gets angry with people and does not go out to eat because he shakes too much. (R. 238-239). Plaintiff indicated he only ventured out of his house two times per month, but he also indicated he still did some fishing. (R. 238-239).

On June 27, 2002, a consultative physical examination was performed by Dr. Stanley Rabinowitz, M.D. (R. 288-290). Plaintiff's chief complaints were listed as joint and back pain, and "trauma." (R. 288). Plaintiff complained of difficulty sitting, standing, bending, turning, twisting and lifting heavy objects. (R. 288). Plaintiff attributed occasional shortness of breath to smoking. (R. 289). Plaintiff indicated that he could walk long distances but at a slow pace. (R. 289). According to plaintiff, he had a 10-year history of pain, for which he took Advil or aspirin. (R. 288). Dr. Rabinowitz observed normal gait, clear chest, normal range of motion, and mild tremors of the body and head, with a neurological exam within normal limits. (R. 289-290). Dr. Rabinowitz found that plaintiff had degenerative joint disease; chronic cervical and lumbar spine pain syndrome, probably secondary to degenerative joint/disc disease; a history of alcohol usage; a history of chronic depression; and that plaintiff smoked cigarettes. (R. 290).

Also on June 27, 2002, a consultative intellectual assessment was performed by Dr. William W. Stempniak, Ph.D. (R. 291-293). Testing revealed plaintiff had a verbal IQ of 81,

performance IQ of 84; and full scale IQ of 80.  (R. 291).  Plaintiff, who had an 11th grade special education, was found to have reading and written expression disorders, was functioning at the low average range verbally and average range when words are not required, and was deemed capable of managing his own funds.  (R. 293).

In July 2002, an agency psychologist, Dr. Donald E. Henson, opined that, based on the aforementioned IQ testing, plaintiff exhibited  "high borderline" intellectual functioning.  (R. 284).  Dr. Henson thought plaintiff's mental status would impose only a mild degree of limitation on activities of daily living and maintenance, social functioning and the ability to maintain concentration, persistence or pace.  (R. 282).

In January 2003, plaintiff went to Dr. Michael D. Robbins, M.D., seeking a physical evaluation for purposes of obtaining disability benefits.  (R. 373).  Plaintiff's chief complaint was shortness of breath, and he also cited neck pain and a progressive tremor.  (R. 373).  With respect to plaintiff's lungs, Dr. Robbins observed rare crackles and wheezes, decreased air movement, a prolonged expiratory phase and a barrel chest.  (R. 372).  The doctor indicated emphysema was a concern, less likely cardiac or asthmatic in nature.  (R. 372).  There was no observed tenderness in plaintiff's back, and his strength was rated 5/5.  (R. 372).  Tylenol was recommended.  (R. 372).  A fine tremor was noted and a halting gait.  (R. 372).  Dr. Robbins thought a neurological evaluation and chest and back x-rays would be helpful.  (R. 372).  Dr. Robbins examined plaintiff again in January 2003, and opined that plaintiff's nasal congestion and postnasal drip were attributable to allergic rhinitis or sinusitis.  (R. 320).  At that time, Dr. Robbins considered plaintiff to be capable of a full range of the activities of daily living but incapable of lifting more than 10 pounds at a time. (R. 297).

Plaintiff testified at an evidentiary hearing in January 2004. He explained that lack of funds had kept him from seeking medical care. (R. 43). According to plaintiff, for a little more than five years, he had been experiencing back and neck pain, which stemmed from when he was working as a deck hand and had worsened since then. (R. 44-45). At that time, plaintiff continued to do some household chores, although he could stand for only two or three minutes at a time. (R. 46-47). After exertion, to ease the pain, plaintiff had to sit in a recliner for 20-30 minutes and then walk around. (R. 47). Plaintiff was similarly up and down throughout the night, and, as a consequence, he napped a couple of hours during the day. (R. 46 and 48). Plaintiff rated his pain at a level of four and a half or five on a ten scale. (R. 55). Plaintiff used "hands full" of aspirin to ease his pain, to no avail. (R. 48). Plaintiff estimated he was only able to walk one block. (R. 54). Plaintiff used nose spray and pills for his sinuses. (R. 48). Plaintiff admittedly continued to smoke a pack a day. (R. 48). Plaintiff's head tremors, which he testified he had experienced at the current degree for the past four to five years, made it difficult to read. (R. 49 and 56-57). The tremors existed when plaintiff was working as a deck hand, but they worsened after the 1999 accident. (R. 56 and 58-59). Plaintiff also testified that he experienced depression and withdrew from social interaction. (R. 52). Plaintiff indicated that he was not taking any medication for his depression. (R. 52). Plaintiff also testified that he used very little alcohol. (R. 57). Plaintiff's difficulties with reading and math made it difficult for him to follow the recipes when he was working at Gilster-Mary Lee, and he could not lift the 50-100 pound bags of ingredients. (R. 50). According to plaintiff, he cannot work because he cannot concentrate, is constantly using nose spray and is in pain. (R. 54). Plaintiff estimated he could stand for about one hour due to knee pain, could sit for 30-35 minutes and required frequent breaks. (R. 58).

According to a letter from a life-long friend of plaintiff's, Turrill Wayne Young, plaintiff never seemed that same after the 1999 accident. There was a marked difference in his thinking, action, walking and ability to understand simple things. (R. 270). Plaintiff's head and hands shook after the accident, and he would go up to a week at a time without leaving his house. (R. 270).

In August 2004, plaintiff related that he had persistent back and neck pain. (R. 404). At that time, plaintiff was prescribed Ultram, Tylenol and Prozac. (R. 404). When plaintiff saw a pain specialist in September 2004, Dr. Latha Ravi, he described his pain as being 30 on a 0-to-100 scale. (R. 410). Dr. Robbins's September 2004 notes reflect that plaintiff had only minimal osteoarthritic changes. (R. 403). Probable COPD and tremors were also noted. (R. 403). A combivent inhaler was prescribed. (R. 403). One month later, mild chronic inflammatory changes in plaintiff's sinuses were observed, confirmed by an MRI. (R. 402). Plaintiff's breathing was described as better, but not ideal, and his pain was considered controlled, but not ideal. (R. 401). A rheumatologist was suggested. (R. 401). When Dr. Ravi saw plaintiff in November 2004, he noted that plaintiff's back pain was intermittent and his gait was normal; physical therapy was recommended. (R. 405).

In October 2004, Dr. Charisse H. Barta, M.D., performed a neurological consultative examination relative to plaintiff's tremor. (R. 399-400). Dr. Barta observed an action/essential tremor in both of plaintiff's upper extremities and his head. (R. 400). Plaintiff's gait was normal, as was his strength bilaterally, and it was observed that plaintiff did not experience any pain in his muscles and joint upon palpation. (R. 400). Mysoline was prescribed, and it was recorded that plaintiff's inhalers increased the tremor. (R. 400). Within weeks, it was noted the medication had

improved the tremor. (R. 441). Dr. Robbins's November 23, 2004, treatment notes reflect that the tremor was greatly improved, except when plaintiff was anxious or worried, and that Prozac had improved his mood, although not to the ideal level. (R. 438). Plaintiff was reportedly feeling quite well with the Ultram and Tylenol that he was taking for low back pain. (R. 438). Persistent sinus drainage treated for years with Afrin was noted, but the doctor recorded that plaintiff's sinuses were not tender on that date. (R. 438).

In February 2005, Dr. Robbins reported that plaintiff's tremor was resolved and that he was exhibiting no back and neck symptoms. (R. 437). Plaintiff was deemed to be doing well on Prozac, and continued on Tylenol for pain and Mysoline for the tremors. (R. 437). A mildly elevated sedimentation rate and rheumatic factor was noted, but plaintiff refused to consult a rheumatologist. (R. 437). In May 2005, Dr. Robbins recorded that plaintiff reported he was doing pretty well with his back pain. (R. 434). Dr. Robbins also noted probable COPD but also observed that plaintiff was doing quite well on inhalers, and no additional symptoms were listed. (R. 434). In June 2005, Dr. Barta recorded that, approximately eight months after it was first prescribed, the Mysoline had helped quite a bit. (R. 427). Dr. Robbins's notes from mid-September 2005 indicate that plaintiff was not experiencing any neck pain, and his tremor was doing well with medication; however, his breathing issues continued, and so his directed use of inhalers was increased. (R. 429). When plaintiff saw Dr. Robbins in December 2005, he complained of sinus congestion, pain and pressure, but the doctor did not observe any sinus tenderness. (R. 428). Neither neck pain nor shortness of breath was reported. (R. 428). Plaintiff was diagnosed with COPD and directed to stop smoking and continue using inhalers. (R. 428).

In August 2005, plaintiff was seen by Dr. Raymond Leung, M.D., who recognized

that medication had helped initially, but reported that plaintiff's moderate head tremors made it hard for him to focus. (R. 411). Neck pain was observed, causing mild pain and difficulty with range of motion. (R. 411-413). Low back pain was also recorded, but plaintiff retained full range of motion of his lumbar spine. (R. 413-415). Plaintiff's lungs were clear and nothing remarkable was found. (R. 412). Plaintiff was deemed capable of walking one block and lifting no more than 10-15 pounds. (R. 411). Plaintiff's gait was normal. (R. 413). Dr. Leung opined that plaintiff could lift 25 pounds occasionally and 20 pounds frequently, stand at least two hours in an eight-hour workday (affected by back pain) and sit for an unlimited period. (R. 416). Occasional postural limitations were prescribed, and plaintiff's exposure to dust, hazardous machinery, fumes and odors was limited. (R. 416).

Dr. Harry J. Deppe, Ph.D., performed a psychological consultative exam and record review in August 2005. (R. 420-423). Dr. Deppe's report states that plaintiff described himself as an alcoholic (last drink was 10 days prior), who shook when he did not drink. (R. 421). According to Dr. Deppe, plaintiff reported that he spent most of his time fishing, visiting friends and doing housework. (R. 422). Dr. Deppe concluded that plaintiff's ability to do work-related activities was intact. (R. 422). Plaintiff was found to have a personality disorder, with antisocial features, and alcohol dependence, causing moderate impairment of plaintiff's ability to understand, remember and carry out short, simple instructions, and causing marked restriction of his abilities relative to detailed instructions and ability to make judgments on simple work-related decisions. (R. 424). Alcohol was perceived as causing moderate impairment of social functioning and interaction, and marked impairment of plaintiff's ability to respond to pressure and changes in routine. (R. 425).

In January 2006, Dr. Barta wrote a letter recounting that plaintiff had a "fairly

significant" tremor for "many years," which had slowly gotten worse, a history of COPD and chronic back pain. (R. 444-445). The neurologist explained that the essential tremor was unrelated to alcohol abuse in plaintiff's past, that it was worsened by the use of inhalers, and that, although Mysoline can reduce the tremor, it cannot be eliminated. (R. 445).

In February 2006, plaintiff testified at a second evidentiary hearing. He stated that his condition had worsened since the 2004 hearing. (R. 70). Relative to the period from his alleged onset through the date last insured, plaintiff recounted that, in 2002, he had just gotten married and was able to do household chores, although he was hampered by back pain; now, he could no longer do those chores. (R. 81). Plaintiff's head tremors made it hard for him to focus, and, although medication initially helped, it was no longer effective. (R. 84). Plaintiff denied telling Dr. Deppe that he got the shakes from alcohol withdrawal. (R. 82). Plaintiff explained that he was in so much back pain he could not go to physical therapy as his doctor suggested, and his physician would not give him pain medication because it counteracted his antidepressant medication. (R. 85). Prozac had helped calm plaintiff to the extent that he no longer got angry, but he still did not like to be around people. (R. 85-86). Plaintiff explained that his difficulty breathing existed while he was a deck hand, possibly due to exposure to grain dust or from earlier work as an exterminator. (76-68). Plaintiff had long used over-the-counter pills and sprays, but his doctor has prescribed two inhalers. (R. 79-80).

Plaintiff's wife, Carolyn Keener, also testified in February 2006. Recalling plaintiff's condition in 2002, Mrs. Keener described plaintiff as able to perform household chores, although he had to stop and start, and he could not stand for very long. (R. 88). Mrs. Keener recounted that plaintiff got winded just getting up from the couch to let the dog out. (R. 89). Mrs. Keener also

stated that plaintiff did not like to go out because he was embarrassed by his shaking. (R. 89). According to plaintiff's wife, during their first five months of marriage (from January through May, 2002), plaintiff's condition "wasn't that bad" and that it did not start progressing until later. (R. 90-91). Regarding plaintiff's present condition, Mrs. Keener described his legs giving out, and his inability to sit or stand for long or even to watch television. (R. 92). Mrs. Keener opined that medication was no longer helping plaintiff's tremors. (R. 93).

Dr. William C. Houser testified at the February 2006 hearing as a medical expert. When asked what conditions plaintiff had during the period between February and June 2000, before answering, Dr. Houser asked if plaintiff had had a pulmonary function test because the doctor had not seen one in the record. (R. 94-95). Plaintiff had not had such a test, and Dr. Houser stated that he did not need any additional information to complete his medical analysis regarding plaintiff's shortness of breath during that period. (R. 109). The doctor questioned whether plaintiff had COPD, without any pulmonary function data, and opined that, if plaintiff had COPD, it would be no worse than in the mild range, as plaintiff was not symptomatic enough to be significantly limited. (R. 97). The doctor noted an MRI indicating chronic inflammatory changes that could indicated low-grade sinusitis, but he also observed that there was no record of chronic headaches or sinus issues. (R. 101). Dr. Houser further stated that, without an actual diagnosis of a lung condition, it was speculative to attribute such a condition to environmental factors. (R. 106-107). Similarly, Dr. Houser acknowledged evidence of an elevated rheumatoid factor and mildly elevated sedimentation rate but did not view those indicators as dispositive of a diagnosis. (R. 99-100). Dr. Houser did not find any evidence that plaintiff's combined conditions had deteriorated since March 31, 2002. (R. 110).

Dr. Houser was asked to assess plaintiff's physical capacity during the period between the alleged onset in February 2000 and the date last insured, March 31, 2002. (R. 212-214). After reviewing the medical record, Dr. Houser stated that he thought that, since 2000, plaintiff would have been physically unable to perform only medium and heavy work, and he would have had to avoid exposure to dust, smoke and fumes. (R. 112-113). Dr. Houser added that he thought that plaintiff's ability to sit would not have been impaired, and that he could stand for four hours out of an eight-hour workday. (R. 114). Dr. Houser discounted plaintiff's testimony because it was not supported by objective findings for the relevant time period - except for x-ray evidence of arthritis of the spine. (R. 114).

## Vocational Testimony

During the January 2004 evidentiary hearing, vocational expert Dr. John E. Grenfell testified and evaluated a series of hypothetical questions framed around plaintiff's age, education and semiskilled, heavy work experience, albeit with no transferable skills. (R. 60-61). In addition, the hypothetical work was limited to simple tasks where reading, writing and mathematics were not required, and there was only occasional interaction with others, a low-stress work environment without stringent speed or production requirements. (R. 61). If that person could lift and carry 20 pounds occasionally and 10 pounds frequently, and stand for six hours out of an eight-hour workday, Dr. Grenfell opined such a person could perform light, unskilled jobs, such as light custodial work (33,000 in Ill.), watchman (19,000 in Ill.) and certain light laundry jobs (6,000 in Ill.). (R. 61-62). If a sit/stand option were also required, only the watchman jobs would remain available, or jobs as a clerk in a self-serve gas station (1,800 in Ill.). (R. 62). If the hypothetical worker could lift only 10 pounds occasionally and five pounds frequently (sedentary work), but could still sit for six hours,

and was unable to sustain a steady gaze secondary to head tremors, no jobs would be available.  (R. 63).

Dr. Grenfell subsequently clarified in writing that his January 2004 testimony was consistent with the Dictionary of Occupational Tiles.  (R. 267).  Dr. Grenfell also addressed an additional hypothetical scenario regarding whether unskilled, sedentary work would be available where no reading, writing or mathematics was required, and if the worker had a constant, mild tremor moderately interfering with his/her ability sustaining a steady gaze.  According to Dr. Grenfell, no jobs would be available to such a person because unskilled, sedentary jobs require some reading and simple record keeping, and other jobs involving production activity require a steady gaze.  (R. 267).

Vocational expert Dr. Thomas Upton testified at the February 2006 evidentiary hearing regarding an additional series of hypothetical questions premised upon plaintiff's age, education and work experience.  (R. 115-116).  If such a person were limited to medium exertion and unskilled work, and could only occasionally be exposed to temperature extremes and respiratory irritants, and the work could not require reading, writing and mathematics, the following jobs would be available:  kitchen helper (2,100 jobs in Ill.); machine tender (1,700 jobs in Ill.); laundry worker (2,000 jobs in Ill.); laundry worker at light level (1,900 jobs in Ill.); assembly worker at medium level (15,800 jobs in Ill.);  assembly worker at light level (37,900 jobs in Ill.); and assembly worker at sedentary level (8,000 jobs in Ill.).  (R. 115-116).   If there could be no exposure to dust, fumes, excessive heat and excessive moisture, the kitchen and laundry jobs would be eliminated.  (R. 118-119).  If a person could only stand for 30 minutes, only sedentary positions would remain, and if the person also had a restricted range of motion in the upper extremities and could not perform repetitive

reaching movement, then all work would be precluded. (R. 119). If an occasional mild tremor that moderately affects the ability to sustain a steady gaze is factored into the equation, Dr. Upton opined that the aforementioned job quantities would be reduced by 50%. (R. 117). If the tremor were mild and moderately interfered with the ability to sustain a steady gaze, work would be precluded. (R. 117-118). Relative to the period prior to August 22, 2005, the ALJ cited the testimony of vocational expert Dr. Thomas Upton that the following jobs remained available to a person with the aforementioned profile: kitchen helper (5,100 light jobs in Ill.); machine tender (1,600 light jobs and 1,700 sedentary jobs in Ill.); laundry worker (2,000 light jobs and 1,900 sedentary jobs in Ill.); and assembler (37,900 light jobs and 8,000 sedentary jobs in Ill.). (R. 30).

## Analysis

### Onset of Disability

Plaintiff argues that ALJ Pritchett should have recontacted plaintiff's treating physician, Dr. Robbins, or other physicians, for additional evidence or clarification regarding the onset date and the severity of plaintiff's symptoms.

An applicant bears the "burden of supplying adequate records and evidence" regarding an impairment, its severity and the relevant time frame. ***Scheck v. Barnhart,*** **357 F.3d 697, 702 (7th Cir. 2004).** In accordance with 20 C.F.R. § 404.1512(e)(1), when the evidence received from a medical source(s) is "inadequate" to determine disability, the ALJ may recontact the medical source(s) to obtain the necessary evidence. Additional evidence or clarification from a source will be sought if there is a conflict or ambiguity that must be resolved, or the report does not contain all the necessary information, or a more detailed report is needed. **20 C.F.R. § 404.1512(e)(1).** However, the medical source need not be recontacted if it is known from past

experience that the source cannot or will not provide the necessary findings. **20 C.F.R. § 404.1512(e)(2).** It is axiomatic that, if there is adequate evidence for a determination, the ALJ is not required to recontact a medical source or gather additional evidence. ***See Skarbek v. Barnhardt*, 390 F.3d 500, 504 (7th Cir. 2004).**

Plaintiff contends clarification was needed regarding the severity of plaintiff's tremors on the dates closest to the February 15, 2000, alleged onset date. Plaintiff focuses on the ALJ's comparison of Dr. Leung's 2005 evaluation of plaintiff's tremor, and Dr. Rabinowitz's 2002 evaluation. More specifically, plaintiff takes issue with the ALJ's distinction between the words "mild" and "moderate" as an indication of a worsening condition.

As a preliminary matter, the Court observes that plaintiff appears to have lost sight of the fact that the adjective used means little or nothing; it is the residual functional capacity that is central to the disability determination. The ALJ specified that evidence prior to August 22, 2005, did not support the conclusion that tremors had more than a minimal effect on plaintiff's ability to perform basic work activities. (R. 23). The ALJ did not rely *solely* on the shift in description of the tremors from mild to moderate. There is no conflict, ambiguity or lack of evidence that warranted recontacting any of the physicians who reported on plaintiff's condition. In this situation, there is substantial evidence in the record regarding plaintiff's tremor and its impact, or lack thereof.

In February 1999, when plaintiff was hospitalized after an automobile accident, his tremor was not significant enough to merit notation in his medical records. Plaintiff's own testimony regarding his condition in the first few months of 2002 did not highlight his tremor as an impediment to his activities. As examples, he did not cite his tremor as a reason he could not work at Gilster-Mary Lee; he did not cite his tremor as an impediment when describing how he performed

household chores after he first got married in January 2002; and his wife testified that from January through May 2002 plaintiff's condition "wasn't that bad." (R. 50, 81 and 90-91). Therefore, as of the date plaintiff was last insured, there is no evidence indicating his tremor so affected his ability to maintain a steady gaze, read or otherwise perform the activities of daily living.

In May 2002, when plaintiff applied for benefits, his application did not list his tremor among the cited impairments, although he did note that he had a tremor in a related questionnaire. (R. 209 and 228). When plaintiff saw Dr. Rabinowitz in June 2002, plaintiff did not include tremor as a complaint, although the doctor did recognize a "mild" tremor. (R. 288-290). At that same time, plaintiff was able to complete an IQ test, without any noted problem related to his tremor. (R. 291-293). Thus, ALJ Pritchett was correct in her second decision, abandoning June 27, 2002, as the alleged onset date.

In January 2003, Dr. Robbins described the tremor as "fine," and plaintiff was deemed capable of a full range of activities of daily living. (R. 297 and 392). In January 2004, plaintiff did testify that tremor made it hard for him to read. (R. 49 and 56-57). However, in October 2004, Dr. Barta, a neurologist, saw plaintiff and noted an essential tremor, but did not remark that the tremor had any particular impact on plaintiff. (R. 399-400). Thus, it was not error to not deem plaintiff's tremor a severe impairment in January 2004, and the total impact of all ailments does not appear to be disabling as of October 2004. In any event, Dr. Barta prescribed medication at that juncture, which was reported to be effective in controlling the tremor until August 2005, when plaintiff reported to Dr. Leung that the tremor made it difficult to focus. (R. 411, 437 and 441). It is at that point that the ALJ accepted Dr. Leung's report as sufficient evidence to find disability. The defendant does not challenge that date, despite Dr. Robbins's note in September

2005 that plaintiff's tremor was doing well with medication. (R. 429). The absence of evidence favorable to disability or to the onset date preferred by plaintiff is not cause for shifting the burden to the ALJ to recontact medical sources or gather other evidence.

For the aforestated reasons, the ALJ did not run afoul of Social Security Ruling 83-20 in determining the onset date was August 22, 2005. According to Social Security Ruling 83-20, if disability is of traumatic origin, the onset date is the date of injury. If there is no traumatic origin, the claimant's allegation in the application, or the claimant's testimony, work history, and medical evidence, or other evidence are used to determine the onset date. When the onset date must be inferred, the date must have a legitimate medical basis. The onset date must be set when it is most reasonable to conclude from the evidence that the impairment was sufficiently severe to prevent gainful activity for the requisite 12-month period. ALJ Pritchett's second decision surveyed the evidence and explained the rejection of the alleged February 15, 2000, onset date and the abandonment of the June 27, 2002, onset date found in the first decision and ridiculed by the Appeals Council. Plaintiff's suggestion that the onset date was of traumatic origin, stemming from the February 1999 accident, is contrary to plaintiff's own testimony and the medical evidence. Plaintiff testified he had the tremor *prior* to the accident, and that it was progressive. (R. 49, 56 and 58-59). Hospital records at the time of the accident and subsequent records suggest the tremor is an inherited condition (R. 399). There is simply no medical evidence to support the assertion that it has a traumatic origin. Although plaintiff did not return to work for 11 months, in his application for benefits, plaintiff specified that he did not work in 1999 because he was "between jobs," not because of disability. (R. 212). Plaintiff subsequently told Dr. Deppe, who was performing a consultative psychological exam, that he "switched jobs for more money and that didn't work out."

(R. 422).  The ALJ fully complied with Social Security Ruling 83-20 and the criteria for setting the onset date for an impairment without traumatic origin.

In ***Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345 (7th Cir. 2005)**, the Court of Appeals for the Seventh Circuit observed that, in the case of slowly progressing impairments, Ruling 83-20 does not require the impairment to reach "listing severity," *i.e.* the degree where it is presumptively disabling based on medical grounds, before onset can be established.  However, as prescribed in *Briscoe*, Social Security Ruling 83-20 and 20 C.F.R. § 404.1512(e), the ALJ's analysis and conclusion regarding the onset date is sufficiently articulated and supported by substantial evidence.  Again, plaintiff ignores the fact that it is the impact of any ailment and the 12-month durational requirement that are central to the disability determination, even one of traumatic origin. *See* **SSR 83-20.**

Plaintiff notes that the Appeals Council directed the ALJ to use a medical expert, *if* necessary, to determine the onset date.  (R. 192).  The ALJ utilized a medical expert, Dr. Houser, but not specifically to determine the onset date.  For the aforestated reasons, Dr. Houser's assistance was not necessary to determine the onset date.  A review of the evidence clearly and reasonably leads to the August 22, 2005 date found by the ALJ.

Finally, plaintiff argues that the ALJ ignored vocational expert Grenfell's written testimony that unskilled sedentary work requires some reading and simple record keeping and that production jobs require repetitive motion and watching what one does.  (R. 267).  The ALJ's decision is entirely consistent with that testimony, in that disability was found as of August 22, 2005, when it was reasonable to conclude from the medical evidence in the record that plaintiff could not sustain a gaze.  The fact that Dr. Grenfell offered that testimony in May 2004 is irrelevant,

because the evidence did not support such a conclusion at that time.

**Additional Testing**

Plaintiff argues that the ALJ erred in discounting plaintiff's subjective complaints due to the lack of objective medical evidence of his impairments when he could not afford medical care, and the agency refused to order testing. Plaintiff's argument cites Social Security Rule 96-7p, which requires an ALJ to specifically articulate the rationale for any credibility determination relative to the consideration of pain and its functional effects. ***Brindisi v. Barnhart*, 315 F.3d 783, (7th Cir. 2003).**

> The reasons for the credibility finding must be grounded in the evidence and articulated in the determination or decision. It is not sufficient to make a conclusory statement that "the individual's allegations have been considered" or that "the allegations are (or are not) credible." ... The determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight.

***Brindisi*, 315 F.3d at 787 (quoting from SSR 96-7p).**

The applicant bears the "burden of supplying adequate records and evidence" regarding an impairment, its severity and the relevant time frame. ***Scheck v. Barnhart,* 357 F.3d 697, 702 (7th Cir. 2004).** In this instance, it is difficult to perceive how additional testing would have aided plaintiff. According to plaintiff, his condition has gotten progressively worse in all respects since 1999. Although plaintiff could not afford medical care until 2004, Dr. Robbins's 2003 consultative exam indicated plaintiff could perform the full range of daily activities and did not otherwise support a finding of disability (R. 297), and, according to plaintiff and his wife, in 2002 he was still capable of performing household chores. To suggest that agency-financed testing would have somehow uncovered that plaintiff's condition was worse than even he indicated is pure

speculation and an unreasonable attempt to shift the burden of proof. As analyzed above, the subjective and objective evidence relative to 2003 and 2004 simply do not support a finding of disability. Contrary to plaintiff's assertions, Dr. Houser, the medical expert who testified at the 2006 hearing, did not indicate a pulmonary function test was needed; rather, he specifically stated no additional evidence was needed to complete his medical evaluation. (R. 94-95, 97 and 109).

### Vocational Issues

At step five in the analytical framework, the burden shifts to the agency to demonstrate the claimant can successfully perform a significant number of jobs existing in the national economy. *Young v. Barnhart*, **362 F.3d 995, 1000 (7th Cir. 2004).** Plaintiff contends: (1) the ALJ failed to pose a hypothetical to the vocational expert which incorporated all of plaintiff's limitations supported by medical and other evidence; and (2) the ALJ failed to inquire of the vocational expert in the second hearing whether his testimony corresponds with the Dictionary of Occupational Titles.

### The Hypotheticals

The hypothetical questions posed to a vocational expert must incorporate all of the claimant's limitations supported by medical evidence in the record. *See Indoranto v. Barnhart,* **374 F.3d 470, 474 (7th Cir. 2004); *Young,* 362 F.3d at 1003**. "The hypothetical need not include every physical limitation, provided that the vocational expert had the opportunity to learn of the applicant's limitations through, for example, an independent review of the medical records or through other questioning at the hearing. Nevertheless, where the hypothetical does not include all of the applicant's limitations, we must have some amount of evidence in the record indicating that the vocational expert knew the extent of the applicant's limitations." ***Young,* at *id.* (internal**

**citations omitted).**

ALJ Pritchett found that disability did not occur until August 22, 2005.  Prior to August 22, 2005, plaintiff was found to have the following severe impairments:  reading disorder, disorder of written expression, COPD, and alcohol abuse and dependence.  (R. 23 and 30).  As of August 22, 2005, two additional severe impairments were added:  essential tremors and neck pain with a limited range of motion.  (R. 26, 28 and 30-31).  From a physical standpoint, prior to August 22, 2005, plaintiff was found to be capable of lifting and carrying 20 pounds occasionally and 10 pounds frequently, standing and/or walking and sitting for up to six hours out of an eight-hour workday.[4]  (R. 28).  Only occasional exposure to temperature extremes and respiratory irritants (dust, fumes and gases) was prescribed, and plaintiff was further limited to unskilled work where reading, writing and mathematics were not required.  (R. 28).  From a psychological standpoint, the ALJ concluded plaintiff had only mild limitation upon activities of daily living and maintaining social functioning, and moderate limitation on his ability to maintain concentration, persistence or pace.  (R. 29).  The ALJ cited the testimony of vocational expert Dr. Thomas Upton that the following jobs remained available to a person with the aforementioned  profile:  kitchen helper (5,100 light jobs in Ill.); machine tender (1,600 light jobs and 1,700 sedentary jobs in Ill.); laundry worker (2,000 light jobs and 1,900 sedentary jobs in Ill.); and assembler (37,900 light jobs and 8,000

_____

[4]"Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time."
**20 C.F.R. § 404.1567(b).**

sedentary jobs in Ill.). (R. 30).

At the 2006 hearing, Dr. Upton was posed multiple hypothetical questions all premised upon a a person of plaintiff's age, education and work history. The relevant hypothetical inquired if such a person were limited to medium exertion and unskilled work, and could only occasionally be exposed to temperature extremes and respiratory irritants, and the work could not require reading, writing and mathematics. Dr. Upton opined that the following jobs would be available: kitchen helper (2,100 jobs in Ill.); machine tender (1,700 jobs in Ill.); laundry worker (2,000 jobs in Ill.); laundry worker at light level (1,900 jobs in Ill.); assembly worker at medium level (15,800 jobs in Ill.); assembly worker at light level (37,900 jobs in Ill.); and assembly worker at sedentary level (8,000 jobs in Ill.). (R. 115-116). Dr. Upton further testified that, if there could be no exposure to dust, fumes, excessive heat and excessive moisture, the kitchen and laundry jobs would be eliminated. (R. 118-119). If a person could only stand for 30 minutes, only sedentary positions would remain, and if the person also had a restricted range of motion in the upper extremities and could not perform repetitive reaching movement, then all work would be precluded. (R. 119). If an occasional mild tremor that moderately affects the ability to sustain a steady gaze is factored into the equation, Dr. Upton opined that the aforementioned job quantities would be reduced by 50%. (R. 117). If the tremor were mild and moderately interfered with the ability to sustain a steady gaze, work would be precluded. (R. 117-118).

Plaintiff argues that the ALJ and vocational expert disregarded mental and physical limitations relevant to what jobs would remain available to plaintiff. More specifically, plaintiff cites his processing speed IQ of 71 and working memory IQ of 73, which he contends would exclude jobs where pace and production were critical, and/or where more than simple one-step tasks were

required. Plaintiff also asserts that he has an obvious inability to interact appropriately with the public, his peers and supervisors, due to his embarrassment about his tremor. Plaintiff cites Dr. Deppe's report as support for his position. In addition, plaintiff contends that the hypothetical should have included that he has shortness of breath and frequent severe headaches.

Relative to psychological factors, plaintiff ignores the July 2002 opinion of psychologist Dr. Donald Henson that plaintiff's mental status would impose only a mild degree of limitation on activities of daily living and maintenance, social functioning and the ability to maintain concentration, persistence or pace. (R. 282). Dr. Henson relied on the same test results cited by plaintiff. Plaintiff also ignores that even Dr. Deppe concluded that plaintiff's ability to perform work-related activities was intact. (R. 422). The hypothetical's reference to unskilled work not requiring reading writing or mathematics adequately represents plaintiff's limitations. Unskilled work requires little or no judgment (**20 C.F.R.§ 404.1565(a)**), and there is no evidence to support any degree of limitation beyond that reflected by Drs. Henson's and Deppe's evaluations. Plaintiff's assertion that he had an obvious inability to socially interact flies in the face of the psychologists' reports, and there is evidence that plaintiff continued to interact socially. Plaintiff and his supervisor did not cite such factors as cause for his not being able to perform the cake mixer job at Gilster-Mary Lee. Plaintiff was also reportedly doing well on Prozac. Therefore, the hypothetical did not have to reflect these specific psychological factors.

Plaintiff's shortness of breath has already been addressed and will not be rehashed, except to note that Dr. Houser observed that plaintiff's COPD was no more than a mild limitation and not significantly limiting. (R. 97). The physical limitations referenced in the hypothetical adequately reflect the impact of plaintiff's breathing difficulties. Plaintiff's assertion that the

hypothetical should have included frequent severe headaches is unsupported by the subjective and objective evidence. Therefore, the hypothetical posed to ALJ Upton sufficiently reflected the limitations supported by the record.

**<u>Dictionary of Occupational Titles</u>**

Although the hypothetical posed to Dr. Upton adequately reflects all of plaintiff's limitations, contrary to the assertion in ALJ Pritchett's decision, she did not inquire whether Dr. Upton's testimony about available jobs was consistent with the Dictionary of Occupational Titles. The agency does not dispute this point; rather, it argues that plaintiff has waived this point of error. More specifically, the agency notes that, in his brief, plaintiff does not raise any inconsistencies.

In *Prochaska v. Barnhart*, **454 F.3d 731 (7th Cir. 2006)**, the Court of Appeals for the Seventh Circuit, relying on Social Security Ruling 00-4p, held that the ALJ has an affirmative duty to ask about possible conflicts with the Dictionary of Occupational Titles and to elicit a reasonable explanation for any apparent conflict. *Id*. **at 735.** The appellate court recognized that an expert's opinion cannot constitute substantial evidence if the basis for that evidence is not established.

Plaintiff's reply brief raises questions about the jobs cited by Dr. Upton, where his testimony indicated the job was medium exertional work, but he further divided the available jobs into light and sedentary groupings, with no explanation. Dr. Upton's testimony is further undermined because there is no indication he reviewed the entire record in forming his answers. (R. 115-119). Therefore, consistent with *Prochaska*, this case must be remanded so that it can be determined whether the answers to the hypothetical questions posed and related job information offered by the vocational expert are consistent with the Dictionary of Occupational Titles and

plaintiff's limitations.

**IT IS THEREFORE ORDERED** that, due to procedural errors and remaining questions related to the vocational testimony relied upon in the decision to deny plaintiff Michael Keener benefits, this action is hereby **REMANDED** to the Social Security Administration for further proceedings. Remand is in accordance with "sentence four" of 42 U.S.C. § 405(g), due to an insufficient review of the evidence.

**IT IS SO ORDERED.**

**DATED this 10th day of March, 2008**

**s/Michael J. Reagan**
**MICHAEL J. REAGAN**
**United States District Judge**